IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RONALD M. TARR, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 06-275 Erie |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

### I. INTRODUCTION

Plaintiff, Ronald M. Tarr, seeks judicial review of a
decision of Defendant, Commissioner of Social Security ("the
Commissioner"), denying his application for disability insurance
benefits ("DIB") under Title II of the Social Security Act, 42
U.S.C. §§ 401-433. Presently before the Court are the parties'
cross-motions for summary judgment pursuant to Fed.R.Civ.P. 56.
For the reasons set forth below, (a) Plaintiff's motion for
summary judgment will be granted in part; (b) the Commissioner's
motion for summary judgment will be denied; and (c) the case will
be remanded to the Commissioner for further proceedings
consistent with this Memorandum Opinion.

1

## **II. Procedural History**

Plaintiff filed an application for DIB on January 16, 2004, alleging disability since August 12, 2002 due to a right shoulder injury and diabetes.[1] (Certified Copy of Record before the Social Security Administration, Docket No. 4, "R." at 54-57, 75). Following the denial of Plaintiff's application for DIB on June 1, 2004, he requested a hearing before an Administrative Law Judge ("ALJ"). (R. 34-38, 39-40). At the hearing, which was held on March 22, 2006, Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified. (R. 227-50). In addition to his right shoulder injury and diabetes, Plaintiff testified at the hearing that back pain also interferes with his ability to work.[2] (R. 240-43).

On May 23, 2006, the ALJ issued a decision denying Plaintiff's application for DIB. Specifically, the ALJ

---

[1]To be granted a period of disability and receive DIB, a claimant must show that he or she contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. <u>See</u> 42 U.S.C. § 423(a). In the present case, Plaintiff's earnings record shows that he has acquired sufficient quarters of coverage to remain insured through September 30, 2008. (R. 14).

[2]Although Plaintiff includes diabetes among his disabling impairments, he did not testify as to any work-related limitations resulting from his diabetes. Moreover, in the brief filed in support of Plaintiff's motion for summary judgment, he concedes that his diabetes is not "a major problem." Rather, Plaintiff's claim of disability is based on the limitations resulting from his right arm, back and leg impairments. (Pl's Brief, p. 9).

concluded that Plaintiff retained the residual functional

capacity ("RFC") to perform sedentary work existing in

significant numbers in the national economy.[3]   (R. 14-25).

Plaintiff requested review of the ALJ's decision.  (R. 11).

However, the request was denied by the Appeals Council on

September 29, 2006, rendering the ALJ's decision the final

decision of the Commissioner.  (R. 5-7).  This appeal followed.

### III.   Personal Background

Plaintiff was born on September 23, 1956,[4] and he has an

11th grade education.  (R. 232).  Plaintiff, who was employed as

a machinist for 24 years, last worked on August 12, 2002 due to

a work-related injury to his right shoulder.[5]   (R. 76, 233-35).

Plaintiff has undergone seven surgical procedures on his

right shoulder, the last of which was performed in April 2004,[6]

---

[3]Under the Social Security Regulations, RFC is defined as
the most a claimant can still do despite his or her limitations,
20 C.F.R. § 404.1545, and sedentary work is defined as follows:
Sedentary work involves lifting no more than 10 pounds at a time
and occasionally lifting or carrying articles like docket files,
ledgers, and small tools.  Although a sedentary job is defined as
one which involves sitting, a certain amount of walking and
standing is often necessary in carrying out job duties.  Jobs are
sedentary if walking and standing are required occasionally and
other sedentary criteria are met.  20 C.F.R. § 404.1567(a).

[4]Plaintiff was 49 years old at the time of the hearing
before the ALJ.

[5]Plaintiff has since settled his claim for Workmen's
Compensation arising out of the right shoulder injury.  (R. 235).

[6]Plaintiff has been informed by his treating physician that
he would receive no benefit from any further surgery on his right

3

and four surgical procedures on his back, the last of which was performed in the early 1990's.[7]   (R. 235-36).  Plaintiff also has been diagnosed with diabetes.  (R. 243).  Due to his lack of medical insurance, Plaintiff pays his medical expenses out of his own pocket.  (R. 236-38).  At the time of the hearing before the ALJ, Plaintiff was taking Glipizide and Metformin for diabetes, Lipitor for high cholesterol and Vicodin for pain.[8]  (R. 102).

Despite his medical impairments, Plaintiff is able to care for his own personal needs, such as bathing and dressing without assistance, and he is able to perform routine household chores, such as preparing a meal, washing the dishes, doing the laundry

---

shoulder.  (R. 236).

[7]Plaintiff returned to work after his back surgeries.  (R. 235).  In this regard, Plaintiff testified as follows: "It always bothered me, but not enough that I couldn't work."  (R. 240).

[8]**Glipizide** is used to treat type 2 (non-insulin dependent) diabetes (formerly "adult-onset"), particularly in people whose diabetes cannot be controlled by diet alone.  **Glipizide** lowers blood sugar by stimulating the pancreas to secrete insulin and helping the body use insulin efficiently.  **Metformin** is used alone or with other medications, including insulin, to treat type 2 diabetes.  **Metformin** helps to control the amount of glucose (sugar) in the blood.  **Lipitor** is used together with lifestyle changes (diet, weight loss, exercise) to reduce the amount of cholesterol (a fat-like substance) and other fatty substances in the blood.  **Vicodin** is a combination of drugs (acetaminophen and hydrocodone) used to relieve moderate to moderately severe pain. www.nlm.nih.gov/medlineplus/druginfo (last visited on August 20, 2007).

4

and keeping the house clean.[9]  Plaintiff engages in no outside

activities and has no interests or hobbies, although he does go

to the movies and out to dinner.  (R. 244).

## IV. Medical Evidence

The medical evidence in the record may be summarized as

follows:

On September 16, 2002, Plaintiff was evaluated by Brian F.

Jewell, M.D., an orthopedic surgeon, for complaints of right

shoulder pain following a work-related injury on August 12,

2002.  Although Plaintiff presented an MRI of his right

shoulder, Dr. Jewell was unable to reach a conclusion due to "a

lot of metal artifact and some motion artifact."[10]  Dr. Jewell

believed that the probability for a rotator cuff tear was high,

_____

[9]With respect to the effect of Plaintiff's right shoulder
injury on his ability to work, Plaintiff testified at the hearing
before the ALJ that he is limited in his ability to lift with his
right arm, as well as his ability to reach in any direction with
his right arm for more than five minutes.  As to the effect of
Plaintiff's low back pain which radiates down his legs on his
ability to work, Plaintiff testified that he is unable to stand
for more than 10 minutes before he has to sit or lie down; that
his ability to sit is limited to 30 to 45 minutes; that he has
difficulty straightening up from a bending position; that he can
lift no more than 5 pounds; and that he needs to lie down for
about 30 minutes at least four times during the day for pain
relief.  (R. 238-42).

[10]Dr. Jewell previously operated on Plaintiff's right
shoulder.  An office note dated August 27, 2001 indicates that
Plaintiff was "doing beautifully" following his last right
shoulder surgery.  Plaintiff had full range of motion, excellent
strength and no fatigue, and he was released to full duty work.
(R. 184).

5

and he ordered physical therapy for Plaintiff, noting that Plaintiff may need revision surgery.[11]  (R. 184).

Plaintiff was re-evaluated by Dr. Jewell on October 14, 2002.  Plaintiff reported no progress in physical therapy,[12] and a decision to proceed with surgical intervention was made.  (R. 183).

On October 23, 2002, Plaintiff was seen by his family physician, James Wilkins, M.D., for pre-operative clearance.  At that time, in addition to his right shoulder problem, Plaintiff reported chronic back pain with pain and tingling in his left foot, as well as fatigue.  As to Plaintiff's past medical history, Dr. Wilkins noted, among other things, that Plaintiff was diagnosed with type 2 diabetes in February 1998; that Plaintiff had undergone a lumbar spinal fusion at L4-5 in approximately 1989 following a work-related accident; that Plaintiff had severe dyslipidemia;[13] and that Plaintiff had

---

[11]In describing his impression, Dr. Jewell stated in part: "I clearly explained to the patient that he has had four surgeries. His last one helped him significantly, and he did well for a long time.  He has been extremely active, maybe past the point of what is good for his health.  At this point, I explained that if we do need to go back into his arm, he is going to have to seriously consider decreased application of torque and heavy torque situations, such as moving wrenches.  He clearly understands this."  (R. 184).

[12]In fact, Plaintiff reported significant pain which was aggravated by the physical therapy.  (R. 183).

[13]Dyslipidemia is a condition marked by abnormal concentrations of lipids or lipoproteins in the blood.  www.nlm.

undergone bilateral rotator cuff repair surgeries - one surgical repair on the left rotator cuff in 1989 and 2 open and 2 arthroscopic repair surgeries on the right in 1999. As to his assessment, Dr. Wilkins concluded that Plaintiff had no evident contraindications to proceeding with the right shoulder surgery as planned, although he had a substantial risk factor, i.e., a considerable risk for occult atherosclerosis.[14]   (R. 211-13).

On October 29, 2002, Dr. Jewell performed diagnostic arthroscopy, as well arthroscopic debridement of a labral tear and an arthroscopic bursectomy, on Plaintiff at UPMC Passavant Hospital. The post-operative diagnosis was described as follows: "Right shoulder recurrent rotator cuff tear. Right shoulder partial rotator cuff tear, right shoulder chronic superior labral tearing and degenerative labral tearing with an acute component and right shoulder mild impingement." (R. 141).

---

nih.gov/medlineplus/mplusdictionary (last visited on August 20, 2007). In his notes of Plaintiff's office visit on October 23, 2002 for pre-operative clearance, Dr. Wilkins noted that Plaintiff's cholesterol level was 825 (<200 is desirable), his triglyceride level was as high as 5,610 mg./dl (>500 is very high) and his HDL level was 22 (<40 indicates an increased risk of coronary heart disease). Plaintiff was instructed to resume taking Lipitor, to have his lipid profile checked in one month and to lose weight. (R. 211-12).

[14]Atherosclerosis is an arteriosclerosis characterized by atheromatous deposits in and fibrosis of the inner layer of the arteries. www.nlm.nih.gov/medlineplus/mplusdictionary (last visited on August 20, 2007). Dr. Wilkins noted that Plaintiff was scheduled for a stress test the next day. (R. 211).

7

Office notes of a follow-up visit with Dr. Jewell on November 11, 2002 indicate that Plaintiff was "looking good," with decreased pain and improving strength. He was placed on significant restrictions with no use of his right arm. (R. 182). Office notes of a follow-up visit with Dr. Jewell on December 16, 2002 indicate that Plaintiff was "doing well." He had near full range of motion ("ROM"), his strength was 4/5 but with fatigue, and he had negative impingement signs, although there was "a little catching around 70 degrees." (R. 181).

Plaintiff returned to Dr. Jewell for a follow-up visit on January 27, 2003. As a result of his physical therapy, Plaintiff had developed "significant bicipital tendonitis." Plaintiff was instructed not to do any physical therapy for 2 weeks and his medications were modified to include a "steroid burst." (R. 181).

The office notes of Plaintiff's next follow-up visit with Dr. Jewell on March 3, 2003 indicate that Plaintiff continued to have significant biceps tendonitis, which, Plaintiff believed, was exacerbated by his physical therapy. Dr. Jewell administered an injection into Plaintiff's bicipital groove, and he was instructed to re-initiate physical therapy in 10 days.[15]

---

[15]Between his follow-up visits with Dr. Jewell in January and March 2003, blood tests were ordered for Plaintiff which showed, among other things, a glucose level of 425 (reference range 65-125) on February 12, 2003. (R. 222).

8

(R. 181). During a follow-up visit on March 31, 2003, Dr. Jewell noted that Plaintiff was "doing poorly."[16] Despite treatment, Plaintiff had ongoing, increasing biceps tendonitis. He was placed on full-time rest for one month, and Dr. Jewell noted that Plaintiff would need to consider biceps tenodesis if the rest failed to resolve the problem.[17] (R. 180).

The office notes of Dr. Jewell relating to a follow-up visit on April 28, 2003 indicate that, despite rest, Plaintiff continued to suffer from biceps tendinitis and rotator cuff pain, and the doctor noted that the only thing he had to offer Plaintiff was arthroscopic evaluation with biceps tenodesis and probable revision of his previous rotator cuff tear repair. Plaintiff was informed that the probability of success of this surgery was only 50% to 70%.[18] (R. 179).

On June 12, 2003, Dr. Jewell performed further right shoulder surgery on Plaintiff at UPMC Passavant Hospital. The

---

[16]Several days before this follow-up visit with Dr. Jewell, Plaintiff's blood tests showed a glucose level of 295 (reference range 65-125), total cholesterol of 272 (<200 is desirable), HDL cholesterol of 38 (>40 is desirable), and a triglyceride level of 1,496 (<150 is desirable). (R. 220). Plaintiff was seen by Dr. Wilkins on April 25, 2003 due to his severely elevated cholesterol, triglyceride and glucose levels. (R. 209).

[17]Tenodesis is the operation of suturing the end of a tendon to a bone. www.nlm.nih.gov/medlineplus/mplusdictionary (last visited on August 20, 2007).

[18]Blood tests approximately a week later showed that Plaintiff's glucose level was 211 (reference range 70-110). (R. 218).

9

post-operative diagnosis was described as "Mild to moderate biceps tendinitis, no evidence of rotator cuff tear, mild bursitis."[19]  (R. 137).  During a follow-up visit with one of Dr. Jewell's associates on June 24, 2003, the doctor noted that, in the supine position, Plaintiff tolerated right shoulder ROM of 160/80/65, and he displayed good isometric external rotator strength.  However, the doctor also noted "some slight prominence of the muscle belly on the right."  Plaintiff was given a prescription for physical therapy and instructed not to use his right arm for reaching, lifting or carrying.  (R. 178).

The office notes of Plaintiff's next follow-up visit with Dr. Jewell on July 14, 2003 indicate that Plaintiff was "doing well" with "minimal pain," although he had some evidence of proximal biceps sagging.  Dr. Jewell believed that it was inflammation and "should settle down."  However, he noted that Plaintiff may have some degree of cosmetic deformity.  (R. 177). During Plaintiff's next follow-up visit on August 25, 2003, Dr. Jewell noted that Plaintiff had "a degree of bicipital rupture and actually has a 'Popeye muscle.'"  He also noted that Plaintiff had "some catching and popping."  Plaintiff was instructed to take a week off from physical therapy, which would

---

[19]Less than a week later, on June 17, 2003, Plaintiff's blood tests showed a glucose level of 241 (reference range 70-110), total cholesterol of 152 (<200 is desirable), and a triglyceride level of 577 (>500 is very high).  (R. 217).

be modified thereafter.  (R. 176).  During his follow-up visit
with Dr. Jewell a month later, on September 22, 2003, the doctor
noted that Plaintiff was "doing much better."  He displayed near
full ROM, his strength was improving, and his bicipital symptoms
were decreasing.  (R. 175).

Plaintiff returned for a follow-up visit with Dr. Jewell on
November 3, 2003.  Dr. Jewell noted that Plaintiff was "not
doing well," that his problems were "mostly bicipital in
nature," and that he was experiencing significant pain down his
biceps.  Dr. Jewell ordered an MRA of Plaintiff's right shoulder
to mid-biceps to evaluate the tenodesis for healing and to
evaluate the right shoulder in general.  Dr. Jewell concluded
his office note as follows: "I think this will be our last
effort.  If there is something that objectively we can fix, we
will go after it.  Otherwise, we are more or less going (sic)
have to consider Ron at [maximum medical improvement] and get on
with things.  Therapy has been discontinued."  (R. 175).

The MRA ordered by Dr. Jewell was performed on November 19,
2003, and the impression included (a) evidence of prior
surgeries with metal artifact from anchor screws, (b) no
findings to indicate recurrent rotator cuff tear and (c) a
probable intraarticular biceps tear.  (R. 107).  On December 12,
2003, Plaintiff underwent an MRI of his right humerus, and the
impression was described, in part, as follows: "The lump seen in

11

the patient's arm is the combination of a balled up and retracted longhead of the biceps tendon with an associated area of fairly extensive edematous change in the proximal portion of the longhead of the biceps muscle." (R. 106).

Plaintiff returned to Dr. Jewell for a follow-up visit on December 15, 2003. Based on a review of his MRA and MRI, Dr. Jewell indicated that Plaintiff appeared "to have ruptured his in situ biceps tenodesis," which the doctor described as "extremely unusual." Dr. Jewell noted that Plaintiff was sore in the bicipital groove and had a retracted distal longhead which was uncomfortable. Dr. Jewell stated that he did "not really know what else to offer him other than repeat arthroscopic evaluation, debridement of the stump and possible open subpectoralis biceps tenedosis," and he told Plaintiff to get a second opinion. (R. 174). On February 16, 2004, after Plaintiff had obtained a second opinion, he returned to see Dr. Jewell. Plaintiff was describing "exquisite pain" with which he could not live, and Dr. Jewell indicated that he was going to perform a further surgical procedure.[20] (R. 173).

---

[20]Approximately a week after this follow-up visit with Dr. Jewell, on February 23, 2004, Plaintiff had blood tests which showed a glucose level of 430 (reference range 65-125). (R. 216). On March 12, 2004, Plaintiff saw Dr. Wilkins for inadequately controlled diabetes and severe dyslipidemia. (R. 208).

12

On April 1, 2004, Dr. Jewell performed further surgery on Plaintiff's right shoulder at UPMC Passavant Hospital.  The post-operative diagnosis was described as follows: "Biceps tendon rupture with significant migration.  Extensive synovitis, right shoulder."[21]  (R. 197).  In the office notes of Plaintiff's follow-up visit on April 19, 2004, Dr. Jewell noted that he had performed "an extensive exploration of [Plaintiff's] shoulder with diagnostic arthroscopy and a partial synovectomy,"[22] as well as "an open subpectoral biceps tenodesis."  Plaintiff's physical examination showed "some sagging of the biceps already," but Plaintiff reported much less pain in the bicipital groove. Although Dr. Jewell was not displeased with the results, he "put significant caution on the odds of this being significantly helpful."  Dr. Jewell noted that Plaintiff was considering other work, and he instructed Plaintiff to be "very cautious" in this regard.[23]  (R. 172).

---

[21]Synovitis is inflammation of a synovial membrane usually associated with pain and swelling of the joint.  www.nlm.nih.gov/medlineplus/mplusdictionary (last visited on August 20, 2007).

[22]Synovectomy is the surgical removal of a synovial membrane, which is a dense connective-tissue membrane that secretes synovial fluid and that lines the ligamentous surfaces of joint capsules, tendon sheaths where free movement is necessary, and bursae.  www.nlm.nih.gov/medlineplus/mplusdictionary (last visited on August 20, 2007).

[23]In a medical report completed on the same day as this office visit in connection with Plaintiff's Workmen's Compensation case, Dr. Jewell indicated that Plaintiff could return to modified duty work, but that Plaintiff had no use of

13

On May 17, 2004, a State agency physician, Dilip S. Kar, M.D., completed a Physical RFC Assessment in connection with Plaintiff's application for DIB based on a review of his file.[24] Dr. Kar opined that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds; that Plaintiff could stand and/or walk about 6 hours in an 8-hour work day; that Plaintiff could sit about 6 hours in an 8-hour work day; and that Plaintiff's ability to push and pull with his upper extremities, as well as his ability to reach in all directions with his right arm, were limited. (R. 186, 188). Dr. Kar indicated that Plaintiff's statements about his limitations were only partially credible, and Dr. Kar noted that, although the issue of disability is reserved to the Commissioner, he gave great and controlling weight to Dr. Jewell's opinion that Plaintiff could return to modified duty work with no use of his right arm. (R. 190-91).

On September 22, 2004, four months after Dr. Kar completed Plaintiff's Physical RFC Assessment, Plaintiff was evaluated by Louis Keppler, M.D., an orthopedic surgeon, for back pain. Dr. Keppler noted that Plaintiff had undergone a lumbar spinal fusion from L4 to S1 in the early 1990's, and that, although Plaintiff had done really well, he was having recurrent symptoms of low back and leg pain and pain radiating into the genital

_____

his right upper extremity. (R. 170).

[24]Dr. Kar specializes in obstetrics and gynecology. (R. 53).

14

area which were aggravated by activities. Dr. Keppler took x-rays of Plaintiff's lumbar spine and performed a neurologic examination. In his office notes, Dr. Keppler indicated that, typically, he would order an MRI; however, Plaintiff's back problems were related to a Workmen's Compensation case and the company that had employed Plaintiff was bankrupt. The costs of diagnostic studies, including an MRI, were explained to Plaintiff, and Dr. Keppler indicated that Plaintiff needed to investigate the Workmen's Compensation situation before he pursued diagnostic studies. Dr. Keppler instructed Plaintiff to return, despite his lack of medical insurance, if his symptoms worsened, if any weakness developed or if he had trouble urinating.[25]   (R. 224).

On August 3, 2005, an MRI of Plaintiff's lumbar spine was performed. The impression was described as follows: "1. Post surgical changes L4/5, L5/S1 fusions. 2. Moderate degree of central canal spinal stenosis L3/4. 3. Disc bulge L2/3. Probable annular tear in the posterior aspect of the L2/3 disc. 4. No evidence of focal disc protrusion or extrusion." (R. 195-96).

Plaintiff returned to Dr. Keppler on August 31, 2005. In a letter to Dr. Wilkins concerning this office visit, Dr. Keppler

---

[25]With respect to Plaintiff's lack of medical insurance, on June 15, 2004, several months before this appointment with Dr. Keppler, Plaintiff cancelled an appointment with Dr. Wilkins for this reason.   (R. 208).

stated that Plaintiff "has a difficult situation with significant degeneration adjacent to a previous lumbar spinal fusion," noting that Plaintiff's condition was basically unchanged since the last time he saw Plaintiff. Dr. Keppler indicated that, ultimately, Plaintiff may require decompression of the spine above the level of his previous fusion if that level was determined to be unstable. However, prior to surgical intervention, Dr. Keppler recommended a trial of epidural and paraspinal injections.[26]   (R. 207).

On September 21, 2005, Plaintiff saw Dr. Wilkins to discuss his need for an epidural block. In the notes of this visit, Dr. Wilkins indicated that Plaintiff had stopped taking Lipitor "awhile ago." (R. 206). Dr. Wilkins ordered blood tests for Plaintiff, which were performed on October 1, 2005. Plaintiff's glucose level was 213 (reference range 65-99), his total cholesterol was 519 (<200 is desirable), and his HDL cholesterol was 9.3 (<5.0 is desirable). (R. 215). Plaintiff saw Dr. Wilkins on October 25, 2005 to discuss the recent blood tests and his current medications. (R. 205).

Plaintiff was referred by Dr. Keppler to the Pain Management Center at Titusville Area Hospital, and, on January

---

[26]In his letter to Dr. Wilkins, Dr. Keppler also noted that Plaintiff was in the midst of some legal issues with respect to coverage for his back condition, and that, hopefully, these legal issues would be resolved in the next few weeks. (R. 207).

16

11, 2006, he was seen by Robert R. Concilus, M.D. with a chief
complaint of low back and bilateral leg pain. Dr. Concilus
noted Plaintiff's report that his pain was constant, that
moving, particularly getting out of bed, made the pain worse,
and that Vicodin, which was being prescribed by Dr. Wilkins,
provided some relief. Plaintiff's physical examination showed
that Plaintiff was uncomfortable when he stood or ambulated. In
addition, he had marked diminution in the lumbar ROM and some
tenderness in the lower right lumbar paraspinal region. Dr.
Concilus described his impression as "[b]ack and leg pain,
lumbar radiculopathy and localized back pain, failed laminectomy
syndrome all following a work related injury," and he indicated
that Plaintiff would return for epidural and local injections.
(R. 202-03).

On January 25, 2006, Dr. Concilus administered an epidural
block in Plaintiff's right L2/3 epidural space and two posterior
nerve blocks at the right L3 and L5 lumbar levels. Dr. Concilus
noted that the procedure was complicated by Plaintiff's previous
spinal fusions, and that Plaintiff was very anxious. He also
noted that Plaintiff would follow-up for possible repeat
injections. (R. 200).

During the follow-up visit with Dr. Concilus on February
22, 2006, Plaintiff reported no benefit from the initial
injections. Nevertheless, he underwent additional injections.

17

Dr. Concilus indicated that any further injections would be inappropriate if Plaintiff derived no relief from the second round of injections.  (R. 199).

On April 27, 2006, Plaintiff was seen at Dr. Keppler's office by Denise Rezek, a physician's assistant, for a follow-up visit with respect to his back and leg pain.  Plaintiff continued to complain of "exquisite pain" in the right side of his low back which radiated down both legs.  In addition, Plaintiff complained of numbness in the distal end of his right lower leg and all of his toes.  Plaintiff reported that he needed to lie down approximately three times a day to relieve the pain.  He also reported increased pain with standing, bending, twisting, sitting and weather changes.  On physical examination, Plaintiff's ability to rotate was limited due to pain.  However, his bilateral lower extremity strength was 5/5, he was able to ambulate on his heels and toes, and his straight leg raises were negative.  Plaintiff informed Ms. Rezek that he continued to take Vicodin, that he was involved in litigation regarding his back condition, and that he could not maintain a job at this time due to his discomfort.  Plaintiff was advised as to activity and exercise and instructed to follow-up with Dr. Keppler "when he can."  (R. 223).

## V.   Jurisdiction and Standard of Review

The Court has jurisdiction of this appeal under Section 405(g) of the Social Security Act, which provides that an individual may obtain judicial review of any final decision of the Commissioner by bringing a civil action in the district court of the United States for the judicial district in which the individual resides.  Based upon the pleadings and the transcript of the record, the district court has the power to enter a judgment affirming, modifying or reversing the Commissioner's decision with or without a remand for a rehearing.  42 U.S.C. § 405(g).

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971).  It consists of something more than a mere scintilla, but something less than a preponderance.  Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979).  Even if the Court would have decided the case differently, it must accord deference to the Commissioner and affirm the findings and decision if supported by substantial evidence.  Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190-91 (3d Cir.1986).

19

## **VI.  Legal Analysis**

### **A.  The ALJ's Decision**

In order to establish a disability under the Social
Security Act, a claimant must demonstrate an inability to engage
in any substantial gainful activity due to a medically
determinable physical or mental impairment which can be expected
to result in death or which has lasted or can be expected to
last for a continuous period of not less than 12 months.  42
U.S.C. § 423(d)(1).  A claimant is considered unable to engage
in any substantial gainful activity only if his physical or
mental impairment or impairments are of such severity that he is
not only unable to do his previous work but cannot, considering
his age, education, and work experience, engage in any other
kind of substantial gainful work which exists in the national
economy.  42 U.S.C. § 423(d)(2)(A).

In Burnett v. Commissioner of Social Security Admin., 220
F.3d 112 (3d Cir.2000), the United States Court of Appeals for
the Third Circuit discussed the procedure an ALJ must follow in
evaluating a claim for Social Security disability benefits,
stating in relevant part:

*    *    *

In Plummer, we recounted the five step sequential
evaluation for determining whether a claimant is under a
disability, as set forth in 20 C.F.R. § 404.1520:

20

In step one, the Commissioner must determine whether the claimant is currently engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a). If a claimant is found to be engaged in substantial gainful activity, the disability claim will be denied. Bowen v. Yuckert, 482 U.S. 137, 140, 107 S.Ct. 2287, 2290-91, 96 L.Ed.2d 119 (1987). In step two, the Commissioner must determine whether the claimant is suffering from a severe impairment. 20 C.F.R. § 404.1520(c). If the claimant fails to show that her impairments are "severe," she is ineligible for disability benefits.

In step three, the Commissioner compares the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful work. 20 C.F.R. § 404.1520(d). If a claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Step four requires the ALJ to consider whether the claimant retains the residual functional capacity to perform her past relevant work. 20 C.F.R. § 404.1520(d). The claimant bears the burden of demonstrating an inability to return to her past relevant work. Adorno v. Shalala, 40 F.3d 43, 46 (3d Cir.1994).

If the claimant is unable to resume her former occupation, the evaluation moves to the final step. At this stage, the burden of production shifts to the Commissioner, who must demonstrate the claimant is capable of performing other available work in order to deny a claim of disability. 20 C.F.R. § 404.1520(f). The ALJ must show there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and residual functional capacity. **The ALJ must analyze the cumulative effects of all the claimant's impairments in determining whether she is capable of performing work and is not disabled.** (Emphasis added).

Plummer, 186 F.3d at 428.

\*   \*   \*

21

220 F.3d at 118-19.

With respect to the ALJ's application of the sequential
evaluation process in the present case, steps one and two were
resolved in Plaintiff's favor: that is, the ALJ found that
Plaintiff had not engaged in substantial gainful activity since
his alleged onset date of disability in August 2002, and the
medical evidence established that Plaintiff is status post right
shoulder and back injuries with multiple surgeries and that he
suffers from diabetes, which are severe impairments.  (R. 16).
Turning to step three, the ALJ found that Plaintiff's
impairments were not sufficiently severe to meet or equal the
requirements of any listing in 20 C.F.R., Part 404, Subpart P,
Appendix 1, relating to musculoskeletal impairments and diabetes
mellitus.  (R. 16-17).  As to step four, the ALJ found that
Plaintiff could not perform his past relevant work as a
machinist.  (R. 23).  Finally, regarding step five, based on the
testimony of the VE, the ALJ found that Plaintiff retained the
RFC to perform a significant range of sedentary work, including
the jobs of surveillance system monitor, document preparer and
telephone service provider.[27]  (R. 24).

---

[27]The ALJ described Plaintiff's RFC as follows: "the claimant
is capable of performing a range of work at the sedentary level.
He cannot perform overhead reaching with his right dominant hand.
He cannot perform repeated bending at the waist to 90 degrees.
He cannot operate foot controls.  He cannot perform any climbing,
balancing, crawling, or kneeling.  He cannot perform repeated

22

## B. Plaintiff's Motion for Summary Judgment

In his motion for summary judgment seeking a reversal of the Commissioner's decision denying his application for DIB or, in the alternative, a remand of this case for further consideration, Plaintiff raises several arguments which the Court will address individually.

1.

With respect to the impact of a claimant's age on the disability determination, the Social Security Regulations provide in relevant part:

**§ 404.1563  Your age as a vocational factor.**

\*   \*   \*

(b) *How we apply the age categories.* When we make a finding about your ability to do other work under § 404.1520(f)(1), we will use the age categories in paragraphs (c) through (e) of this section. We will use each of the age categories that applies to you during the period for which we must determine if you are disabled. **We will not apply the age categories mechanically in a borderline situation. If you are within a few days or a few months of reaching an older age category, and using the older age category would result in a determination or decision that you are disabled, we will consider whether to use the older age category after evaluating the overall impact of all the factors of your case.** (Emphasis added).

(c) *Younger person.* If you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work. However, in some circumstances, we consider that persons

---

pushing/pulling or frequent gripping/grasping with his right arm. Additionally, he cannot lift over 5 pounds with his right arm." (R. 17).

age 45-49 are more limited in their ability to adjust to other work than persons who have not attained age 45. See Rule 201.17 in appendix 2.

(d) *Person closely approaching advanced age.* If you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work.

\*   \*   \*

20 C.F.R. § 404.1563(b), (c) and (d).

In determining that Plaintiff could perform sedentary work existing in significant numbers in the national economy despite his impairments, the ALJ limited his consideration to Plaintiff's age on August 12, 2002 - the date on which Plaintiff alleges he became unable to work. At that time, Plaintiff was 45 years old or a "younger individual" under the Social Security Regulations. Noting that he was 4 months shy of his 50th birthday at the time the ALJ issued his decision on May 23, 2006, and that if he had been considered a person "closely approaching advanced age," rather than a "younger individual," he would be presumed to be disabled under the rules in the Medical-Vocational Guidelines, commonly referred to as "the grids," which are set forth in 20 C.F.R., Part 404, Subpart P, Appendix 2,[28] Plaintiff asserts that the ALJ erred by failing to

---

[28]Social Security Rulings are agency rulings published "under the authority of the Commissioner of Social Security" and "are binding on all components of the Social Security Administration." Sykes v. Apfel, 228 F.3d 259, 271 (3d Cir.2000). With regard to

24

consider the issue of borderline age in accordance with 20

C.F.R. § 404.1563(b).  Specifically, under Rule 201.10, an

individual (a) whose RFC is limited to sedentary work, (b) who

is closely approaching advanced age (ages 50 to 54), (c) who has

a limited education, and (d) whose previous work experience was

skilled or semiskilled but the skills are not transferable to

other work, is presumed to be disabled.[29]  Thus, Plaintiff seeks

application of the grids in a case such as this one, where the
claimant's impairments result in both exertional and non-
exertional limitations, Social Security Ruling 83-14 notes the
following: The rules in the grids take into consideration a
disability claimant's physical ability (*i.e.*, ability to perform
sedentary, light or medium work), age, education and previous
work experience.  If the person's impairments result solely in
exertional limitations, which include standing, walking, sitting,
lifting, carrying, pushing and pulling, the rules in the grids
direct a finding that the person is disabled or not disabled
depending on the combination of these factors.  If, on the other
hand, the person's impairments also result in non-exertional
limitations, such as maintaining body equilibrium, using the
fingers and finger tips to work with small objects, using the
eyes and ears to see and hear, using the vocal apparatus to
speak, intellectual competence and ability to function in terms
of behavior, affect, thought, memory, orientation and contact
with reality, the grids are used only as a framework for
decisionmaking.  However, where a person's RFC, age, education
and work experience coincide with the criteria of an exertionally
based rule in the grids and that rule directs a conclusion of
"disabled," there is no need to consider the additional effects
of a nonexertional limitation since consideration of it would add
nothing to the fact of disability.

[29]In support of this argument, Plaintiff cites Rule 201.14 of
the grids, which applies to individuals who are at least high
school graduates with respect to education.  (Pl's Brief, p. 7).
Due to his 11th grade education, which is considered limited
under the Social Security Regulations, see 20 C.F.R.
§ 404.1564(b)(3), Rule 201.10 applies to Plaintiff, not Rule
201.14.  Under either rule, however, Plaintiff would have been
presumed to be disabled if the ALJ had considered him a person

25

a remand of this matter for consideration of his borderline age
at the time of the ALJ's adverse decision.[30]

After consideration, the Court agrees with Plaintiff that
the ALJ should have addressed the issue of borderline age in
this case in light of the fact that Plaintiff was exactly 4
months shy of his 50th birthday at the time the ALJ rendered his
decision, and the fact that such consideration may have resulted
in a change in the outcome of this case.[31]  See, e.g., Cox v.
Apfel, No. 98-7039, 1998 WL 864118, at *4 (10th Cir. Dec. 14,
1998)(stating that "because claimant was within six months of
the next age category, that is, advanced age, at the time the

"closely approaching advanced age" at the time of his decision.

[30]As noted previously, in his decision, the ALJ limited his
consideration to Plaintiff's age at the time of his alleged onset
of disability in August 2002.  In so doing, the ALJ erred.  A
claimant's age at the time of the ALJ's decision governs in
applying the Social Security Regulations, not his or her age on
the date of the alleged onset of disability.  See, e.g., Varley
v. Secretary of Health & Human Services, 820 F.2d 777, 780-81
(6th Cir.1987)("The fact that a claimant who is unable to engage
in [substantial gainful] activity at the time of the decision may
have been able to do so at some point in the past goes to the
question of the onset date, not the question of disability.").

[31]Although the ALJ clearly did not address the issue of
borderline age in his decision denying Plaintiff's claim for DIB,
the Commissioner asserts that Plaintiff's argument in this regard
has no merit, providing several grounds to support the ALJ's
limitation of his consideration to Plaintiff's age as of the date
of his alleged onset of disability.  (Df's Brief, pp. 19-22).  As
noted by Plaintiff, however, a district court may not affirm an
administrative agency's decision by relying on theories argued on
appeal by the Commissioner that are not contained in the
decision.  (Pl's Brief, p. 3).  See Fargnoli v. Massanari, 247
F.3d 34, 44 n.7 (3d Cir.2001).

ALJ issued his decision, he erred by not addressing whether [claimant] was of borderline age before choosing a rule from the grids"); Crook v. Barnhart, 244 F.Supp.2d 1281 (N.D.Ala.2003) (finding that claimant, who was 54½ years old at time of adverse decision, presented borderline age situation which ALJ should have considered); Pickard v. Commissioner of Social Security, 224 F.Supp.2d 1161 (W.D.Tenn.2002)(finding that ALJ erred by failing to consider claimant's borderline age when she was four months and one day shy of her 55th birthday at time of decision); Smith v. Barnhart, No. 00 C 2643, 2002 WL 126107, at *3 (N.D.Ill. Jan. 31, 2002)(noting that cases tend to treat claimants who are within six months of 50 years old as presenting borderline age cases); Summers v. Commissioner of Social Security, No. 3:00CV7201, 2001 WL 1222170 (N.D.Ohio Sept. 27, 2001)(noting that borderline month rule is a rule of leniency that allows a person who is less than six months away from being in the next highest age category to be considered as if he were within that bracket); France v. Apfel, 87 F.Supp.2d 484 (D.Md.2000)(remanding case for further consideration due to ALJ's strict application of age categories and failure to consider fact that claimant was five months shy of her 55th birthday at time of adverse decision); Russell v. Commissioner of Social Security, 20 F.Supp.2d 1133 (W.D.Mich.1998)(stating that Appeals Council Interpretation II-5-302 (effective Mar. 16,

27

1979) "appears to establish that the Appeals Council believes there is a six month window in which a claimant's situation is 'borderline'"); Leyba v. Chater, 983 F.Supp. 1048 (D.N.Mex.1996) (finding that ALJ was required to make individualized determination of appropriate age category for claimant who was 3½ months shy of his 55th birthday).

Based on the foregoing, the case will be remanded to the Commissioner for further consideration. However, on remand, the issue that needs to be addressed is limited. On September 23, 2006, after the ALJ's decision and before the expiration of Plaintiff's insured status for purposes of DIB,[32] he attained the age of 50 years. Therefore, Plaintiff moved into the age category of "closely approaching advanced age" while this claim was pending,[33] and, based on the ALJ's findings of limited education and irrelevance of transferable skills due to age, Plaintiff must be found disabled under Rule 201.10 of the grids as of September 23, 2006. See Daniels v. Apfel, 154 F.3d 1129, 1132 & n.4 (10th Cir.1998)(holding that when claim remains pending after claimant's insured status has expired, claimant's age for purposes of applying the grids is determined at the time

---

[32]As noted previously, Plaintiff's insured status for purposes of DIB does not expire until September 30, 2008.  (R. 14).

[33]In fact, Plaintiff moved into the age category of "closely approaching advance age" before the Appeals Council denied his request for review of the ALJ's decision on September 29, 2006.

his insured status expired). Thus, Plaintiff is entitled to DIB at least from his 50th birthday on September 23, 2006. Accordingly, the Commissioner will be directed to grant Plaintiff's application for DIB as of September 23, 2006, and the case will be remanded for consideration of whether Plaintiff became disabled before that date.

**2.**

Next, Plaintiff asserts that the ALJ's assessment of the medical evidence in this case was erroneous for several reasons. After consideration, the Court agrees.

Turning first to Plaintiff's right arm impairment, in his adverse decision, the ALJ noted that (a) Dr. Jewell never opined that Plaintiff was disabled from all work, (b) there was no evidence of any further treatment of Plaintiff's right shoulder impairment after his follow-up visit with Dr. Jewell in April 2004, which the ALJ emphasized was **"over two years ago"** at the time of his decision denying Plaintiff's claim for DIB (R. 19), (c) Plaintiff did not mention any right upper extremity pain or limitations to Dr. Keppler at the time he sought treatment for back and leg pain in September 2004, and (d) Plaintiff made no specific complaints of right upper extremity pain to Dr. Concilus at the pain clinic during his initial evaluation in January 2006, limiting the report of his medical history to "some shoulder problems." (R. 202).

With respect to the issue of the absence of an opinion by
Dr. Jewell that Plaintiff is disabled from all work, as noted by
Plaintiff, the issue of disability is reserved to the
Commissioner and treating source opinions on issues reserved to
the Commissioner are never entitled to controlling weight or
special significance. See Social Security Ruling 96-5p.
Therefore, the absence of a disability opinion by Dr. Jewell
does not support the ALJ's adverse decision.[34]  As to the ALJ's
emphasis on the lack of evidence of any treatment for
Plaintiff's right shoulder impairment after April 2004, as noted
by Plaintiff, the ALJ disregarded his testimony that he was
informed by Dr. Jewell that his arm is "as good as it's going to
be" (R. 236), which is corroborated by Dr. Jewell's office
notes. (R. 172, 174-75). In light of this undisputed evidence,
the ALJ's reliance on the absence of treatment after April 2004
to support his adverse decision was erroneous. Finally,
regarding the significance attributed by the ALJ to Plaintiff's
failure to mention upper right extremity pain to Dr. Keppler and
his failure to make specific complaints of right upper extremity

---

[34]In this connection, the Court notes that despite Dr.
Jewell's long-time treatment of Plaintiff for his right shoulder
injury, the Commissioner failed to obtain a Medical Source
Statement concerning Plaintiff's physical ability to perform
work-related activities as a result of the limitations arising
out of his right shoulder impairment. On remand, it is suggested
that the Commissioner obtain such a statement.

pain or limitations to Dr. Concilus, as noted by Plaintiff, he was treated by these doctors for back and leg pain, not right shoulder pain. As a result, the failure of Plaintiff to discuss his right shoulder impairment with these doctors is not significant and does not support the ALJ's adverse decision.

Concerning Plaintiff's back and leg impairments, in his adverse decision, the ALJ placed significance on the following facts: (a) Plaintiff "finally" sought treatment from Dr. Concilus in January 2006, six months after Dr. Keppler recommended injections at a pain clinic, (b) Plaintiff was treated by Dr. Concilus at the pain clinic on only two occasions, (c) Plaintiff's gait was described as normal during an office visit with one of Dr. Keppler's colleagues in April 2006, (d) during the April 2006 office visit with Dr. Keppler's colleague, Plaintiff was advised as to activity and exercise, (e) Plaintiff was "simply maintained on Vicodin" for his back pain, (f) Plaintiff's complaints of back and leg pain did not begin until two years after his alleged onset date, and (g) the physicians who treated Plaintiff for back and leg pain never specifically stated that he was "permanently disabled from all work due to back pain." (R. 22).

As to the ALJ's emphasis on Plaintiff's failure to seek treatment from Dr. Concilus at the pain clinic until six months after such treatment was recommended by Dr. Keppler, as noted by

31

Plaintiff, the time span between the recommendation and the treatment was four months, not six months. More importantly, however, the ALJ totally ignores the fact that Plaintiff's back and leg impairments were related to a Workmen's Compensation claim and the insurance carrier apparently was disputing coverage for treatment of Plaintiff's back and leg impairments. Under the circumstances, Plaintiff's delay in seeking treatment from Dr. Concilus at the pain clinic does not undermine his claim of disabling back and leg pain.

Regarding the ALJ's emphasis on the fact that Plaintiff was treated at the pain clinic on only two occasions, as noted by Plaintiff, the ALJ ignores the fact that the injections administered by Dr. Concilus did not relieve Plaintiff's pain. Therefore, Dr. Concilus did not recommend any further injections after the second round of injections. (R. 199). Clearly, the fact that Plaintiff did not return to the pain clinic for further injections when the injections provided no relief from pain does not undermine Plaintiff's claim of disability.

In connection with the emphasis placed by the ALJ on the note of Dr. Keppler's colleague that Plaintiff's gait was normal when she examined him on April 27, 2006, Plaintiff informed Ms. Rezek, a physician's assistant, that his gait becomes "more

antalgic as the day goes on."[35]   (R. 223).   As noted by
Plaintiff, the record does not disclose the time of day of
Plaintiff's appointment with Ms. Rezek on April 27, 2006, and,
if the appointment was scheduled in the morning, the fact that
Plaintiff's gait was normal does not contradict his report that
his gait becomes more antalgic as the day goes on.   Accordingly,
this office note does not support the ALJ's adverse decision.

    Concerning Ms. Rezek's notation on April 27, 2006 that
Plaintiff was advised as to "activity and exercise," again, the
Court agrees with Plaintiff that the ALJ's emphasis on this fact
does not support his adverse decision.   The types of activities
and exercises discussed with Plaintiff are not set forth in Ms.
Rezek's office notes, and, simply put, the fact that Plaintiff
is able to engage in some activity and perform some exercises
does not support a conclusion that Plaintiff can engage in
substantial gainful activity on a regular and continuing basis,
which is defined as 8 hours a day, 5 days a week.   See Social
Security Ruling 96-9p; Smith v. Califano, 637 F.2d 968 (3d Cir.
1981)(Sporadic or transitory activity of disability insurance
benefits claimant does not disprove disability).   Under the

---

[35]An antalgic gait is a limp in which a phase of the gait is
shorter on the injured side to alleviate the pain experienced
when bearing weight on that side.

circumstances, this office note also does not support the ALJ's adverse decision.

As to the ALJ's statement that Plaintiff was "simply maintained on Vicodin" for his back pain, as noted by Plaintiff, contrary to the ALJ's implication, Vicodin is a narcotic pain medication, which is a strong and potentially addictive form of medication that should only be administered by a physician.   The fact that Plaintiff's physician prescribes Vicodin to control his back and leg pain supports, rather than undermines, Plaintiff's claim of disabling and does not support the ALJ's adverse decision.

Respecting the ALJ's observation that Plaintiff's complaints of back and leg pain did not begin until two years after his alleged onset date of disability, as noted by Plaintiff, even if his complaints of back and leg pain did not begin until September 2004 when he was evaluated by Dr. Keppler, the complaints began a year and a half before the administrative hearing in this case.[36]   The two-year lapse, standing alone, does not undermine Plaintiff's claim of disability.   Rather, it may

---

[36]In this regard, the Court notes that there is evidence in the record of complaints of back pain by Plaintiff as early as October 23, 2002.   Specifically, on that date, during an evaluation by Dr. Wilkens for upcoming right shoulder surgery, Plaintiff reported chronic low back pain.   (R. 211).

34

have an impact on the date on which Plaintiff became disabled - the limited issue to be addressed on remand.

Finally, with regard to the ALJ's statement that the physicians who treated Plaintiff for back and leg pain never specifically opined that he was "permanently disabled from all work," again, as noted in connection with the same observation relating to Plaintiff's treatment for right shoulder pain by Dr. Jewell, the issue of disability is reserved to the Commissioner and treating source opinions on issues reserved to the Commissioner are never entitled to controlling weight or special significance.[37]   See Social Security Ruling 96-5p.  Moreover, as Plaintiff further notes, "permanent" disability is not a prerequisite to receipt of DIB.

The Court further agrees with Plaintiff that in denying his claim for DIB, the ALJ erred by giving "considerable" weight to the opinion of the non-examining State agency physician concerning Plaintiff's ability to engage in physical work-related activities.  First and foremost, the Physical RFC Assessment was completed by Dr. Kar in May 2004 and Plaintiff's

---

[37]As noted in connection with the absence of a Medical Source Statement from Dr. Jewell, see footnote 34, in light of the treatment provided to Plaintiff by Drs. Keppler and Concilus for back and leg pain, it is suggested that the Commissioner obtain such statements from these treating doctors on remand to determine Plaintiff's physical ability to engage in work-related activities.

treatment for severe back and leg pain did not begin until
September 2004, when he was evaluated by Dr. Keppler. As a
result, Dr. Kar's opinion was based entirely on the evidence
pertaining to Plaintiff's right shoulder impairment, and it is
well established that a claimant's combined impairments must be
considered in making a disability determination.[38] Second, Dr.
Kar specializes in obstetrics and gynecology, not orthopedics,
and more weight is given to the opinion of a specialist about
medical issues related to his or her area of specialty than to
the opinion of a source who is not a specialist with respect to
the alleged impairment. See 20 C.F.R. § 404.1527(d)(5).
Accordingly, the ALJ erred in attributing significant weight to
the Physical RFC Assessment completed by Dr. Kar in May 2004.

In sum, in light of Plaintiff's undisputed right shoulder,
back and leg impairments, multiple surgeries, long treatment
history, the absence of any opinion by a treating or examining
source on the physical work-related limitations resulting from
Plaintiff's combined orthopedic impairments and the foregoing
discussion concerning the ALJ's erroneous evaluation of the
evidence of record, on remand, the Commissioner is directed to

---

[38]In this regard, the Court notes Plaintiff's testimony at
the hearing before the ALJ that his back pain had become more
severe than his right shoulder pain. (R. 240).

(a) obtain such an opinion from an examining source,[39] and (b) further evaluate the medical evidence to determine whether Plaintiff became disabled before September 23, 2006, the day on which he turned 50 years old and moved into the age category of "closely approaching advanced age" while this claim was pending.

3.

In his determination, the ALJ finds that Plaintiff's statements concerning the intensity, duration and limiting effects of his symptoms are not entirely credible. Plaintiff challenges this finding, and, after consideration, the Court agrees that, on remand, the Commissioner should re-visit the issue of Plaintiff's credibility. Specifically, as noted by Plaintiff, the ALJ minimized the objective medical evidence supporting Plaintiff's claim of disabling back and leg pain, the type of medication prescribed to control Plaintiff's back and

---

[39] In this connection, the Court notes that 20 C.F.R. § 404.1545(a)(3) provides in relevant part: "We will assess your residual functional capacity based on all of the relevant medical and other evidence. In general, you are responsible for providing the evidence we will use to make a finding about your residual functional capacity.... However, before we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources...." Despite this regulation, there are no reports in the record from Dr. Jewell, Dr. Keppler, Dr. Concilus, Dr. Wilkens or a consultative examiner concerning Plaintiff's physical work-related limitations due to his combined right shoulder, back and leg impairments. Thus, there is no evidence to support the ALJ's RFC assessment.

37

leg pain, the type of treatment sought by Plaintiff to relieve
his back and leg pain, and the frequency of Plaintiff's
treatment for back and leg pain.  In so doing, the ALJ ignored
the fact that objective medical evidence, *i.e.*, the MRI of
Plaintiff's lumbar spine in August 2005, showed (a) post-
surgical changes at the site of Plaintiff's L4/5, L5/S1 fusions,
(b) a moderate degree of central canal spinal stenosis at L3/4,
(c) a disc bulge at L2/3 and (d) a probable annular tear in the
posterior aspect of the L2/3 disc; that Dr. Keppler opined that
Plaintiff "has a difficult situation with significant
degeneration adjacent to a previous lumbar spinal fusion;" that
Vicodin is a narcotic pain medication prescribed for severe
pain; that Plaintiff underwent epidural injections to his lumbar
spine in an unsuccessful attempt to alleviate his back and leg
pain; that neither Dr. Keppler nor Dr. Concilus ever questioned
the credibility of Plaintiff's complaints of severe back and leg
pain; and that Plaintiff's intermittent treatment for back and
leg pain was attributable to a dispute with a Workmen's
Compensation carrier and Plaintiff's lack of medical insurance.

     In finding that Plaintiff was less than credible with
regard to his complaints of disabling back and leg pain, the ALJ
also cited Plaintiff's testimony concerning his ability to care
for his personal needs, independently perform chores, drive a
car, watch television and socialize with friends.  (R. 22).  As

noted by Plaintiff, these limited activities, without more, do not support a conclusion that he is able to engage in substantial gainful activity on a regular and continuing basis, i.e., 8 hours a day, 5 days a week.

With respect to the credibility determination, the ALJ also erroneously failed to take into account Plaintiff's long work history. As noted by Plaintiff, when a claimant has worked for a long period of time, his testimony about his work capabilities should be afforded substantial credibility. See Taybron v. Harris, 667 F.2d 412, 415 n.6 (3dCir.1981). In the present case, Plaintiff worked as a machinist for 24 years. In fact, following four back surgeries in the early 1990's, Plaintiff returned to his job as a machinist for many years.

Based on the foregoing, a further evaluation of Plaintiff's credibility should be performed on remand.

William L. Standish
United States District Judge

Date: August 21, 2007

39